IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KEYCORP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:16-CV-1948-D |
| VS. | § | |
| | § | |
| ALLISON HOLLAND, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff KeyCorp ("Key") moves for a preliminary injunction ordering defendants Allison Holland ("Holland") and Martin Mbeteni ("Mbeteni") to submit to computer forensic examinations and removal of Key information, extending and enforcing Holland's non-solicitation agreement, and restraining Holland and Mbeteni from using or disclosing Key's confidential, proprietary, and trade secret information.[1] For reasons that follow,[2] the court grants the motion as to Mbeteni (who has consented to the entry of a preliminary injunction) and grants in part and denies in part the motion as to Holland.

---

[1] Key's preliminary injunction motion is before the court under the procedure permitted by Fed. R. Civ. P. 43(c), and is being decided on the papers without an evidentiary hearing. *See, e.g., Wireless Agents, L.L.C. v. Sony Ericsson Mobile Commc'ns AB*, 390 F.Supp.2d 532, 533 n.1 (N.D. Tex. 2005) (Fitzwater, J.) (addressing former Rule 43(e)), *aff'd*, 189 Fed. Appx. 965 (Fed. Cir. 2006).

[2] Pursuant to Rule 52(a), the court sets out its findings of fact and conclusions of law in this memorandum opinion and order.

I

Key is a retail and commercial bank. Holland worked in the health care commercial real estate unit of Key from August 2009 to July 2015. Her responsibilities included analyzing financing packages and selling them to clients. Mbeteni worked for Key from May 2010 to August 2015. He and Holland worked together on health care commercial real estate transactions.

During their employment, Holland and Mbeteni each signed an Agreement Regarding Trade Secrets, Intellectual Property, and Non-Solicitation of Employees ("Trade Secret-Non-Solicitation Agreement"). The Trade Secret-Non-Solicitation Agreement required employees to keep confidential a variety of Key information after leaving, including trade secrets, financial information, compilations and lists, and business information, and included the following provisions:

> I recognize the importance of preserving the confidentiality of Trade Secrets of KeyCorp. Therefore, I agree that: (a) during my employment with KeyCorp, I will acquire, reproduce, and use such Trade Secrets only to the extent reasonably necessary for the proper performance of my duties; (b) during and after my employment with KeyCorp, I will not use, publish, sell, trade or otherwise disclose such Trade Secrets; and (c) upon termination of my employment with KeyCorp, I will immediately return to KeyCorp all documents, data, information, and equipment in my possession or to which I have access that may contain such Trade Secrets. I agree to sign nondisclosure agreements in favor of KeyCorp and others doing business with KeyCorp with whom KeyCorp has a confidential relationship . . . .
>
> b. "Trade Secrets" mean information covered by the Uniform Trade Secrets Act as adopted in Ohio [Ohio Rev. Code § 1333.61(D)] and, in addition thereto, any and all processes,

> techniques, programs, software, formulas, methods, financial information, compilations and lists, and other business information or plans that are developed, owned, utilized, or maintained by an employer such as KeyCorp, and that of its customers or suppliers, and that are not in the public domain.

P. App. 18. Key also maintained policies such as a Code of Ethics and Information Asset Management Standards that informed employees about proper handling of confidential information, and to which employees were required to consent periodically.

Holland also signed a separate Acceptance Agreement, in which she agreed not to "call upon, solicit, or do business with any Key customer or potential customer with whom [she] interacted . . . while employed at Key" for one year after leaving Key's employ. *Id.* at 20.

Holland left Key to work in a similar role at defendant Capital One Financial Corporation ("Capital One"). She took her Outlook Contact List ("Contact List") with her by emailing it to her personal email account. Key and Holland both characterize the Contact List as "contact information" for people, including people with whom Holland did business on behalf of Key. *See* P. Br. 21; Holland Br. 8. Key's supplementary appendix contains what appears to be a copy of the Contact List—a list of names, most with a corresponding company and email address. P. Supp. App. 883-91. During Holland's first year after moving from Key to Capital One, she emailed and may have met with representatives from at least one client with whom she had dealt while employed at Key.

A few weeks after Holland's departure, Mbeteni left Key and joined Holland at Capital One. Shortly before leaving Key, Mbeteni sent a large number of documents—over

50 emails containing over 600 attachments—from his Key email account to personal email accounts. The attachments included spreadsheets known as "sizers" used to analyze financial transactions, quote memos used to communicate the strengths and weaknesses of a deal, and prospect lists containing Key assessments of clients' needs. Mbeteni later forwarded eight of these emails from his personal accounts to his Capital One account. The eight emails contained Key sizers and prospect lists.

After Holland was employed at Capital One, but before Mbeteni had left Key, Holland requested a quote memo template from Mbeteni. Mbeteni obliged by emailing Holland (at her Capital One account) a Fannie Mae quote memo for a completed Key transaction. This quote memo contained financial information for the transaction and Key's comments on winning the deal, and was marked confidential. Mbeteni also sent several Key sizers to Holland while she was employed at Capital One.

Key brought this action against Holland, Mbeteni, and Capital One. Key alleges trade secret misappropriation under Ohio law against Holland and Mbeteni, breach of the Trade Secret-Non-Solicitation Agreement against Holland and Mbeteni, and breach of the Acceptance Agreement's nonsolicitation provision against Holland.[3] Key moves for a preliminary injunction ordering forensic examinations of Holland's and Mbeteni's computers and removal of any Key information that may be found, extending and enforcing Holland's non-solicitation agreement, and enjoining Holland and Mbeteni from using or disclosing

---

[3] Key also alleges trade secret misappropriation under 18 U.S.C. § 1836 and Texas law against Capital One, but it does not seek relief against Capital One in this motion.

- 4 -

Key's confidential, proprietary, and trade secret information. Mbeteni has consented to a preliminary injunction, but Holland opposes the motion. The court will therefore focus on whether Key is entitled to relief against Holland.

II

To obtain a preliminary injunction, Key must establish the following: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm the injunction may do to defendants; and (4) that granting the preliminary injunction will not disserve the public interest. *See, e.g., Jones v. Bush*, 122 F.Supp.2d 713, 718 (N.D. Tex. 2000) (Fitzwater, J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000) (unpublished table decision). Key must satisfy all four requirements.

"A preliminary injunction 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.'" *Id.* (quoting *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989)). "The decision to grant a preliminary injunction 'is to be treated as the exception rather than the rule.'" *Id.* (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (stating that movant must "clearly carr[y] the burden of persuasion")). "'The decision whether to grant a preliminary injunction is within the discretion of the court, but it is an extraordinary remedy that should only be granted if the movant has clearly carried its burden.'" *John Crane Prod. Solutions, Inc. v. R2R & D, LLC*, 861 F.Supp.2d 792, 794 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *TGI Friday's, Inc. v. Great Nw. Rest., Inc.*, 652

F.Supp.2d 763, 767 (N.D. Tex. 2009) (Fitzwater, C.J.)). In addition, mandatory preliminary relief, such as Key seeks,[4] "which goes well beyond simply maintaining the status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citations omitted).

III

The court first addresses whether Key has shown a substantial likelihood that it will prevail on the merits of its claims.

A

Key alleges that Holland misappropriated trade secrets in violation of Ohio law.

1

The Ohio Uniform Trade Secrets Act defines a trade secret as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

---

[4] Key requests in part that the court order Holland to submit to computer forensic examinations, and order her non-solicitation agreement extended. These aspects of the requested relief are mandatory rather than prohibitory.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). Further, the statute defines misappropriation as acquisition by one who knows or has reason to know that the trade secret was acquired by improper means, or disclosure or use by one who acquired the trade secret through improper means. Ohio Rev. Code § 1333.61(B).

The Supreme Court of Ohio uses a six-factor test for analyzing trade secret claims under this statute:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Salemi v. Cleveland Metroparks*, 49 N.E.3d 1296, 1302 (Ohio 2016) (internal quotation marks omitted). In addition, Ohio decisions have specifically addressed how these factors apply when a customer list is alleged to be a trade secret. "[A] business's customer list . . . constitutes an intangible asset that is presumptively a trade secret when the owner of the list takes measures to prevent its disclosure in the ordinary course of business to persons other than those selected by the owner." *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 380 (Ohio 2000).

> [T]o be a trade secret, a customer list must contain more than a list of names, when the identity of the customers is readily ascertainable through ordinary business channels or through classified business or trade directories. Rather, it must contain information not generally known to or readily ascertainable by the public.

*Salemi*, 49 N.E.3d at 1302 (citations and internal quotation marks omitted).

2

Key contends that Holland misappropriated trade secrets when she took her Contact List upon leaving Key. According to Key, the Contact List is a trade secret because it reflects years of business development that Holland performed for Key. Key also argues that the Contact List should be considered a trade secret because it contains pathways to the critical decisionmakers at Key's customers. *See Thermodyn Corp. v. 3M Co.*, 593 F.Supp.2d 972, 987-88 (N.D. Ohio 2008) (holding that customer lists can constitute trade secrets).

Holland responds that her Contact List is not a trade secret because it contains nothing beyond mere names and contact information. Holland argues that, under Ohio law, a document must contain more than customers' names to receive trade secret protection as a customer list. *See In re Urgent Med. Care, Inc.*, 153 B.R. 784, 789 (Bankr. S.D. Ohio 1993) (holding that client list was not a trade secret "[a]bsent additonal information about the [client]'s requirements and preferences"); *Salemi*, 49 N.E.3d at 1302 ("[T]o be a trade secret, a customer list must contain more than a list of names, when the identity of the customers is readily ascertainable through ordinary business channels or through classified business or trade directories." (internal quotation marks omitted)); *State ex rel. Lucas Cnty. Bd. of*

*Comm'rs. v. Ohio Envtl. Prot. Agency*, 724 N.E.2d 411, 418-19 (Ohio 2000) (distinguishing *In re Urgent Medical Care* to hold that landfill's client list, which also contained information about client requirements, was trade secret); *Besser*, 732 N.E.2d at 380 (holding that hospital's list of top patient-volume physicians "and their characteristics" was trade secret).

Holland maintains that although the Contact List contains names and contact information of borrowers who are active in commercial real estate, it does not contain any of the preferences and requirements that Key used to do business with them. *See In re Urgent Med. Care*, 153 B.R. at 789. Holland also posits that the information in the Contact List is readily ascertainable by the public. She contends that the information in her email contacts was publicly available through Internet and social media searches. *See Salemi*, 49 N.E.3d at 1302.

The court concludes that Key has not established that Holland's Contact List is a trade secret under Ohio law. The Contact List appears to contain the names of Holland's contacts, their employer companies, and email addresses. The clients' "requirements and preferences" do not appear here, as required for trade secret protection. *See In re Urgent Med. Care*, 153 B.R. at 789. And Key's argument that the names are a pathway to decisionmakers at client entities cannot distinguish the Contact List from a mere "list of names," which is not a trade secret in Ohio. *See Salemi*, 49 N.E.3d at 1302. Finally, Key has not presented evidence regarding whether the names and email addresses in the Contact List were publicly available. *See id.* For these reasons, the court concludes that Key has not shown a substantial likelihood that it will prevail on the merits of its trade secret misappropriation claim against

Holland for taking the Contact List.

3

Key next alleges that Holland misappropriated trade secrets by receiving a Key quote memo from Mbeteni while she was working at Capital One. Key contends that Holland requested a Fannie Mae quote memo from Mbeteni while he was employed by Key, and that Holland retained the document, rather than return it to Key, when it turned out to be a completed Key quote memo that was marked confidential.

Holland responds that she did not request a completed quote memo with confidential content, but rather a publicly available template. She also argues that a quote memo for a completed transaction provides no competitive advantage, and thus should not be considered a trade secret.

The court concludes that Key has established a substantial likelihood that it will prevail on this trade secret claim. Because the quote memo that Holland received was marked by Key as confidential, she should have known that it was not meant to be shared with competitors, which at the time included Holland herself. *See Salemi*, 49 N.E.3d at 1302 (trade secret factors (1) and (3)). And because the quote memo contained Key's confidential analysis of the deal, it had value for doing business in the health care commercial real estate industry. *See id.* (trade secret factors (5) and (6)). Accordingly, Key has shown a substantial likelihood that it will prevail on the merits of its trade secret misappropriation claim against Holland for requesting and retaining the quote memo.

B

The court now turns to Key's contract claims against Holland.

1

In addition to its statutory trade secret misappropriation claims, Key also alleges that Holland breached a contract—the Trade Secret-Non-Solicitation Agreement—when she took information from Key. *See Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (setting out elements of contract claim in Ohio). Because the Trade Secret-Non-Solicitation Agreement prohibits the taking or disclosing of Key trade secrets, as defined by Ohio law, misappropriation of a Key trade secret also constitutes a breach of the agreement. Accordingly, Key has shown a substantial likelihood that it will prevail on the merits of its claim for breach of the Trade Secret-Non-Solicitation Agreement to the extent already set out above.

2

But just as with its trade secret claim, Key has failed to show a substantial likelihood of prevailing on a contract claim against Holland for taking the Contact List. Although the Trade Secret-Non-Solicitation Agreement protects a broader range of information than does Ohio trade secret law, the agreement is still limited by its terms to protecting information that is "not in the public domain." P. App. 18. Holland maintains that this public domain exception controls her situation, because the information contained in her email contacts was publicly available. Key has not presented evidence, beyond conclusory assertions, showing whether the information in the Contact List was publicly available. As a result, Key has not

shown a substantial likelihood of success on the merits of its contract claim against Holland for taking her Contact List.

3

Key also brings another, separate contract claim against Holland for breach of the Acceptance Agreement. This agreement obligated her not to "call upon, solicit, or do business with any Key customer or potential customer with whom [she] interacted . . . while employed at Key" for one year after leaving Key. P. App. 20. In particular, Key contends that Holland engaged in an email dialogue with the CEO of one Key client; arranged to meet with him at an industry conference; arranged a meeting with two other representatives of the same client; and worked on a loan deal for a separate Key client.

Holland responds that she did not originate, and was not involved with, the deal that Capital One closed with a former Key client. Holland also maintains that her only contact with a former Key client was to facilitate a meeting between the client and representatives of a government agency, at the agency's request.

Although Key's evidence includes emails between Holland and the CEO of a Key client, the record does not establish that Holland either solicited or did business with the client (although the CEO goes so far as to suggest they do business). Accordingly, Key has not shown a substantial likelihood of success on the merits of its claim for breach of the Acceptance Agreement. *See Kostelnik*, 770 N.E.2d at 61.

IV

The court next addresses whether Key has shown a substantial threat that it will be irreparably injured in the absence of injunctive relief.

A

Ohio law recognizes that disclosure of trade secrets can establish irreparable harm. "As a general matter, no adequate remedy at law exists for the disclosure of trade secrets." *Brookville Equip. Corp. v. City of Cincinnati*, 2012 WL 3324235, at *6 (Ohio Ct. App. Aug. 15, 2012); *see Patio Enclosures, Inc. v. Herbst*, 39 Fed. Appx. 964, 969 (6th Cir. 2002). Loss of customer goodwill, such as from the breach of a nonsolicitation or noncompete agreement, is also recognized as irreparable harm under Ohio law. *See Office Depot, Inc. v. Impact Office Prods., LLC*, 2011 WL 4833117, at *12 (N.D. Ohio Oct. 12, 2011) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992)).

Key contends that it will be irreparably harmed in the absence of injunctive relief because Holland has already disclosed Key trade secrets, and may do so again. Key also maintains that violations of a customer non-solicitation agreement (such as the Acceptance Agreement in this case) threaten Key's customer goodwill, risking irreparable harm.

Holland responds that Key's delay of approximately 10 months in seeking an injunction refutes its characterization of the injury as irreparable. *See Wireless Agents, L.L.C. v. T-Mobile, USA, Inc.*, 2006 WL 1540587, at *4-5 (N.D. Tex. June 6, 2006) (Fitzwater, J.) (holding irreparable harm negated where no evidence explained two-year delay from time of discovery to requesting injunction).

In reply, Key contends that a good explanation exists for its delay in seeking injunctive relief. *See Grand Lodge, Fraternal Order of Police v. Labor Council Mich. Fraternal Order of Police, Inc.*, 1994 WL 589569, at *3 (6th Cir. Oct. 24, 1994) (holding irreparable harm shown where delay was due to change in counsel and efforts to resolve dispute out of court). Key maintains that, after discovering Holland and Mbeteni's actions, it began negotiating with Capital One to obtain an internal forensic investigation; conducted pre-suit discovery, including deposing Mbeteni; participated in settlement negotiations with the defendants; continued its own investigation; and eventually filed the complaint in this case.

B

The court concludes that Key has established a substantial threat that it will suffer irreparable injury if the injunction is not granted. Key has a persuasive explanation for the delays that Holland identifies. Key's behavior is more like that in *Grand Lodge*, 1994 WL 589569, at *3, where the plaintiff diligently pursued its claim to the extent possible, than in *Wireless Agents*, 2006 WL 1540587, at *4-5, where the plaintiff could not substantiate an explanation for its two-year delay in seeking relief.

V

Key must also show that the threatened injury to Key outweighs the harm that an injunction may do to Holland, and that granting the preliminary injunction will not disserve the public interest.

Key argues that the proper balance is to protect its legal right, because Holland has

- 14 -

already harmed Key's client relationships, and may do so in the future unless enjoined.  Key also argues that the public interest is best served by upholding valid contracts and promoting fair competition.  *See Johnson Serv. Grp., Inc. v. France*, 763 F.Supp.2d 819, 831 (N.D. Tex. 2011) (Fitzwater, C.J.).

Holland responds that she has already lost a job at Capital One as a result of this dispute, and will have difficulty finding employment in her chosen profession for as long as it continues.  She argues that a preliminary injunction will only increase this hardship.

The court finds that the balance of hardships favors Key with respect to its request for prohibitory relief, and that such relief would not disserve the public interest.  Granting an injunction that enforces the Trade Secret-Non-Solicitation Agreement does not impose any hardship beyond what Holland has already contractually agreed to.  *See id.*  Holland has not shown that any threatened harm from this injunction outweighs the potential injury to Key from loss of its trade secrets and confidential information, or that the public interest would be disserved by enforcing the law of trade secret and contract through a preliminary injunction in this case.

VI

In its motion, Key requests three forms of relief: a mandatory injunction ordering Holland and Mbeteni to submit to computer forensic examination and removal of Key files; a mandatory injunction extending and enforcing Holland's non-solicitation agreement; and a prohibitory injunction restraining Holland and Mbeteni from using or disclosing Key's trade secret, proprietary, and confidential information.

Mbeteni has already consented to the requested relief. With respect to Holland, Key is entitled to a prohibitory injunction, but has not made the more onerous showing required to obtain mandatory relief. *See Martinez*, 544 F.2d at 1243. Key has not established, for example, that Holland is likely to disregard the court's injunction against using or disclosing Key information. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chapman*, 1998 WL 792501, at *4 (N.D. Tex. Nov. 3, 1998) (Fitzwater, J.) (holding preliminary injunction to compel return of trade secret documents was not appropriate where defendant was not likely to disregard court's injunction to maintain confidentiality while case was pending).

\* \* \*

Accordingly, the court finds and concludes that Key is entitled to a preliminary injunction enjoining Holland from using or disclosing Key's trade secret, proprietary, and confidential information, including prospect lists, proprietary analytical tools known as "sizers," proprietary client memoranda and templates, market research, and other confidential and trade secret information. The court also finds and concludes that the relief consented to by Mbeteni should be granted. Key's motion is otherwise denied. The court

is filing a preliminary injunction contemporaneously with the entry of this memorandum opinion and order.

**SO ORDERED**.

January 24, 2017.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE